[No. 44722.   En Banc.   October 26, 1978.]

THE STATE OF WASHINGTON, *Respondent*, v. ALBERT LYMAN BOOGAARD, *Defendant*, RONALD ROBERT STEVENSON, *Appellant*.

*David Allen* of Seattle–King County Public Defender, for appellant.

*Christopher T. Bayley, Prosecuting Attorney,* and *J. Robin Hunt, Deputy,* for respondent.

ROSELLINI, J.—In a prosecution for theft in the second degree (RCW 9A.56.020(1)(a), .040(1)(a)), a jury found the appellant guilty. He appeals from the denial of his motion for a new trial, based on a contention that the verdict had been coerced.

The trial lasted less than 2 days. A University of Washington campus police officer testified that at approximately 3:15 one morning, he had observed the appellant and a companion pushing an arc welder along Stevens Way on the campus and had followed them on foot. When he caught up with them, they had positioned the welder facing the curb adjacent to a spot on a construction site where the appellant's jeep was parked. The appellant had climbed in the back of the jeep and was moving some papers on the floor. When asked about the welder (which belonged to a construction company working on the campus), the appellant said he knew nothing about it. Another officer, in an automobile, had been proceeding in the opposite direction and had passed the scene while the appellant and his companion were allegedly pushing the welder along Stevens Way. He did not observe this activity, but saw the first officer walking toward him. The first officer made a gesture which he understood to be a friendly wave, but which was, according to the first officer's testimony, intended to draw his attention to the appellant, his companion, and the arc welder. The second officer returned to the scene a few minutes later in response to a radio call. At the trial he did not recall having seen the welder on the street, but thought that it was on the construction site.

The appellant gave this explanation of his activities: One of his means of livelihood was collecting paper for recycling. On the night in question he was looking for discarded paper on the campus and had parked at the construction site to explore disposal bins in the area. Returning to the jeep, he saw the arc welder close to his jeep and he and his friend moved it a few feet away so that he would not risk hitting it as he backed the jeep out of the place where it was parked. The officer appeared on the scene at this moment.

Some evidence was also offered by the appellant to show that it would have been very difficult if not impossible for him to have loaded the welder onto the jeep or to have towed it behind the vehicle.

While the State's evidence was ample to sustain the verdict, the testimony was in conflict. The credibility of the witnesses was for the jury to assess, and it cannot be said, upon the record, that no reasonable juror could have entertained a doubt with respect to the State's proof.

The jury began its deliberations in midafternoon. The judge who heard the case was relieved sometime later by a night duty judge. At 9:30 p.m. no verdict had been returned and the judge summoned counsel to report to the courtroom. There was no court reporter on duty at that time. The judge sent the bailiff to inquire how the jury stood numerically (but not with respect to guilt or innocence) and was informed that the vote was 10 to 2.

The judge was faced with the necessity of deciding whether to allow the jury to continue to deliberate until it reached a verdict, which might be very late, or to recess the jury until the following day (which was Veteran's Day, a holiday for court personnel as well as for the public generally) or to the next court day (to which the appellant's counsel had indicated he would object) or to declare a mistrial. To facilitate that decision, he called the jury to the courtroom. In its presence he asked the foreman what the history of the vote had been and how long the vote had stood at each division. After asking the foreman if he thought the jury could reach a verdict in a half hour and receiving an affirmative reply, the judge asked each juror individually for his opinion on this question. All of the jurors except one answered that they believed a verdict could be reached in that length of time. The judge then instructed the jury to return to the jury room and continue its deliberations for a half hour.

Thirty minutes later the jury sent word that it had reached a verdict.

Since these proceedings were not recorded, counsel stipulated to the facts concerning them, according to their best recollection, for purposes of the appellant's motion for a new trial, which followed the entry of judgment on the verdict. The motion was heard before the judge who had sat

upon the trial of the case. That motion was denied upon the court's finding that the questioning of the jury was not intended to influence the deliberations and its conclusion that it had not had this effect.

We can accept the lower court's inference that the questioning was not done with an intent to influence the jury. However, we do not agree with its conclusion as to the probable or possible effect which the procedure had upon the jury.

We have heretofore recognized that the right of jury trial embodies the right to have each juror reach his verdict uninfluenced by factors outside the evidence, the court's proper instructions, and the arguments of counsel; and that an instruction which suggests that a juror who disagrees with the majority should abandon his conscientiously held opinion for the sake of reaching a verdict invades that right, however subtly the suggestion may be expressed. *State v. Ring*, 52 Wn.2d 423, 325 P.2d 730 (1958); *Iverson v. Pacific Am. Fisheries*, 73 Wn.2d 973, 442 P.2d 243 (1968). The questioning of individual jurors, with respect to each juror's opinion regarding the jury's ability to reach a verdict in a prescribed length of time, after the court was apprised of the history of the vote in the presence of the jurors, unavoidably tended to suggest to minority jurors that they should "give in" for the sake of that goal which the judge obviously deemed desirable—namely, a verdict within a half hour.

CrR 6.15(f)(2) provides:

> After jury deliberations have begun, the courts shall not instruct the jury in such a way as to suggest the need for agreement, the consequences of no agreement, or the length of time a jury will be required to deliberate.

The purpose of this rule is to prevent judicial interference in the deliberative process. We have previously held that the jury should not be pressured by the judge into making a decision. *Iverson v. Pacific Am. Fisheries, supra.*

The right to a fair and impartial jury trial demands that a judge not bring to bear coercive pressure upon the delib-

erations of a criminal jury. The United States Supreme Court has said:

> Put simply, the right to be tried by a jury of one's peers finally exacted from the king would be meaningless if the king's judges could call the turn. In the exercise of its functions not only must the jury be free from direct control in its verdict, but it must be free from judicial pressure, both contemporaneous and subsequent.

(Footnote omitted. Citation omitted.) *United States v. Spock,* 416 F.2d 165, 181 (1st Cir. 1969). While permitting the lower federal courts to "nudge" the jury by way of a carefully worded instruction delivered during the deliberative process, in cases where the jury appears to be having difficulty reaching a decision (*Allen v. United States,* 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154 (1896)),[1] that court has forbidden those courts to inquire of the jury how the vote stands at any point before the verdict is rendered. *Brasfield v. United States,* 272 U.S. 448, 450, 71 L. Ed. 345, 47 S. Ct. 135 (1926). There the court said:

---

[1]Such an instruction, intended to prod the jury into a decision, essentially tells the minority jurors to reexamine their own opinions in the light of the majority's opinion and question the reasonableness of their own views. While such an instruction received the approval of the United States Supreme Court, it has since been criticized as coercive (*see* Note, *Due Process, Judicial Economy and the Hung Jury: A Reexamination of the Allen Charge,* 53 Va. L. Rev. 123 (1967); Note, *Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge",* 31 U. Chi. L. Rev. 386 (1964); and Commentary to ABA Standards Relating to Trial by Jury § 5.4(b) (Approved Draft, 1968)). While this court has sustained the giving of an instruction of this type to a jury which requested additional instructions, in *State v. Parker,* 79 Wn.2d 326, 485 P.2d 60 (1971) (a 4–1–2 decision), we have also recognized that such an instruction may be prejudicially coercive. *Iverson v. Pacific Am. Fisheries,* 73 Wn.2d 973, 442 P.2d 243 (1968). *And see State v. Ring,* 52 Wn.2d 423, 325 P.2d 730 (1958).

More recently in promulgating CrR 6.15(f)(2) (adopted April 18, 1973, effective July 1, 1973; amended, adopted August 22, 1973, effective January 2, 1974), we have adopted the policy that instructions suggesting the need for agreement should not be given after the jury begins its deliberations. The rule is in conformity with ABA standards. It was designed to eliminate the possibility of prejudice attendant upon the giving of an "Allen" instruction. See Washington State Judicial Council, Criminal Rules Task Force, *Proposed Rules of Criminal Procedure,* comment 6.17(f)(2) (1971).

We deem it essential to the fair and impartial conduct of the trial, that the inquiry itself should be regarded as ground for reversal. Such procedure serves no useful purpose that cannot be attained by questions not requiring the jury to reveal the nature or extent of its division. Its effect upon a divided jury will often depend upon circumstances which cannot properly be known to the trial judge or to the appellate courts and may vary widely in different situations, but in general its tendency is coercive. It can rarely be resorted to without bringing to bear in some degree, serious although not measurable, an improper influence upon the jury, from whose deliberations every consideration other than that of the evidence and the law as expounded in a proper charge, should be excluded. Such a practice, which is never useful and is generally harmful, is not to be sanctioned.

The respondent draws our attention to the fact that some state courts which have been confronted with the question have not been persuaded to follow the United States Supreme Court's ruling, that court not having rested its decision on constitutional grounds. Those courts which permit the inquiry into the numerical split of jury opinion have done so upon the ground that such information is needed by the trial judge to enable him to ascertain the probability of agreement among the jurors. *Sharplin v. State,* 330 So. 2d 591 (Miss. 1976), and cases cited therein. Those which have disapproved such inquiries have taken the position expounded by the United States Supreme Court that such an inquiry is not useful and may well be prejudicial because of its tendency to impose improper pressure upon the deliberative process. *People v. Wilson,* 390 Mich. 689, 213 N.W.2d 193 (1973). *See* Annot., 85 A.L.R. 1420, 1450 (1933). *See also* 76 Am. Jur. 2d *Trial* § 1059 (1975).

■ Looking to our statutes and rules, we find none which provides for such a procedure. RCW 4.44.330 provides that the court may discharge the jury "after they have been kept together until it satisfactorily appears that there is no probability of their agreeing." Apparently the legislature did not deem it necessary to prescribe a procedure or

criteria whereby the trial judge might determine the probability of agreement. We have not, to date, promulgated a rule covering this matter.

From the absence of any provision for ascertaining the status of deliberation, it can be inferred that the legislature supposed a trial judge could ordinarily evaluate the probability of agreement from the length of time the jury had been deliberating, viewing that in the light of the volume and complexity of the evidence. Ordinarily no inquiry regarding jury proceedings is necessary to facilitate a decision. Where the judge who sits with the jury did not hear the case, information with regard to the nature of the evidence and length of the trial can be supplied by counsel, as was done here.

We are not prepared to say that a trial judge must rely entirely upon such factors and can make no inquiry at all regarding the progress of the deliberations. Here the judge was first advised of the numerical division by the bailiff, who had been sent to inquire of the foreman. Had he confined his inquiry to that procedure, we would find it difficult to say that he exercised undue influence upon the jury. But when he called the jury into the courtroom, asked the foreman to disclose the history of the vote, asked for his opinion on the probability of agreement *within a half hour,* and then inquired of each juror whether or not he believed a verdict could be reached in that length of time, it was inevitable that the minority jurors should feel the pressure of judicial influence.

The suggestion implicit in this questioning process, though unintended, was that the jury should, in the opinion of the judge, come to an agreement soon, preferably within a half hour, and that the agreement should be in accord with the majority opinion, since it was obvious that the minority would not be able to cause the majority to capitulate in such a brief period of time. While it may well be that the jury would have come to the same verdict within the same length of time had there been no judicial confrontation, we cannot know this. The fact that one juror

evidently capitulated in open court and the other gave in within the prescribed half hour justifies an inference that these changes of opinion were based not upon a change of view brought about by the persuasion of fellow jurors, but upon a response to what was thought to be the judge's wishes.

Nor can we conceive that such questioning was necessary to enable the judge to decide what course to follow. It appears that he had determined that it would be reasonable to allow another 30 minutes for deliberation. Had he not recalled the jury but simply allowed them to continue to deliberate, the problem which confronts us would not have arisen. If at the end of that time a verdict had not been returned, he could have decided whether to recess the jury or declare a mistrial. This is the same decision that he would have had to make had the jury not rendered its verdict after the interrogation was conducted. If the questioning was designed to achieve any purpose at all, it was to hasten the verdict, and that is a purpose which cannot be served if the method used is one which tends to influence a juror's decision.

The polling of the jurors upon a question involving their deliberations threatens the prospect of a verdict free from outside influence. That sound procedure does not contemplate such questioning is manifest from the fact that neither the statutes of this state nor the rules of court make any provision for polling of the jury before the verdict is returned.

Since we have determined that the questioning of the individual jurors tended to and most probably did influence the minority jurors to vote with the majority, whether or not their conscientiously held views were changed, a new trial must be ordered.

The judgment is reversed and the cause is remanded for a new trial.

WRIGHT, C.J., and HAMILTON, STAFFORD, UTTER, BRACH-
TENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.

Reconsideration denied December 29, 1978.