[No. 8981-1-I. Division One. January 12, 1981.]

THE STATE OF WASHINGTON, *Respondent*, v. ALVA WASTER McCULLUM, *Appellant*.

*John G. Ziegler of Seattle–King County Public Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Lee D. Yates* and *Christopher Washington, Deputies,* for respondent.

SWANSON, J.—Alva Waster McCullum appeals from a judgment and sentence entered upon his conviction of first degree murder, following a jury trial. His appeal is based on a contention that the actions of the trial judge impermissibly coerced the jury into reaching a verdict. He also assigns error to the trial judge's refusal to consider probation for McCullum pursuant to RCW 9.95.200.

The evidence established that McCullum stabbed William Slater to death on March 23, 1978, in the bar of the Cottage Inn Restaurant in Seattle. The circumstances surrounding Slater's death are essentially undisputed. McCullum's defenses at trial were self–defense and tem-

porary mental irresponsibility. The jury was fully instructed on both defenses. McCullum does not challenge the sufficiency of the evidence.

The jury deliberated from 12:30 p.m. on May 19, 1978, until 6:50 p.m. on May 22, 1978, a total of over 49 hours, before reaching a verdict. In support of his contention that the trial judge's conduct amounted to impermissible coercion of the jury requiring a new trial, McCullum directs our attention to the following incidents which occurred during the deliberation:

At 5:25 p.m. on May 19, the foreman sent out a note asking about the relation between motive and premeditation. The court did not respond to this inquiry. At 5:45 p.m. of the same day, the foreman sent out another note asking, "What would be acceptable proof toward legal (temporary) insanity?" The court advised the bailiff to tell the jury orally that the answer could be found in the court's instructions.

On May 20 at 4:55 p.m., the foreman requested "the testimonies" of four witnesses to the killing. The court told the bailiff to inform the jury that they must rely on their own recollection of the witnesses' testimony. At about 5:55 p.m. of the same day, the foreman sent the judge another note stating that one of the jurors had "expounded" upon his marital breakup of the previous year in which his wife had left him for another man but had subsequently returned pregnant with her lover's child. The note further stated that this juror had been "furious" with the other man, "hates" him, and took his wife back as an act of "revenge" against the other man. The other man had threatened the juror, and the juror, afraid of the man, an ex-boxer, now carries a gun in a briefcase to and from his job. The court made no response to this note.

The record indicates that both counsel for the prosecution and the defense, together with the defendant, were present in the courtroom on the evening of May 20 and were aware of the content of this note to the court. The

trial court stated on the record during sentencing that it had been inclined to declare a mistrial at that point, but both sides had requested that the jury be permitted to continue deliberations.

After the jury had deliberated until approximately 5:30 p.m. of the following day, May 21, the judge called the jury into the courtroom and asked the foreman if there would be any benefit in further deliberations. The foreman stated, "Yes." About 15 minutes later, the foreman had the bailiff notify the court that the jury expected to reach a verdict within an hour. At 10:15 p.m., the judge again brought the jury into the courtroom and inquired of the foreman if he believed the jury could reach a verdict. Again the foreman replied, "Yes."

On May 22, at approximately 3 p.m., the foreman sent another note to the judge which stated, "At this time we are at 11 for guilty of 1st degree 1 against." The judge replied, "Continue your deliberations." Neither the prosecution nor the defense was advised of the receipt of this note nor the information contained in it.

Up to this point, nothing had occurred, in our opinion, that arguably could be called improper communication or impermissible jury coercion. If error, such communications were harmless beyond a reasonable doubt. *State v. Russell,* 25 Wn. App. 933, 611 P.2d 1320 (1980). However, at 3:20 p.m. on May 22, the jury was again returned to the courtroom. The judge asked each juror individually the question, "Is there any benefit in the jury deliberating further?" Each juror answered, "Yes." The judge then directed the jury to return to the jury room and continue their deliberations. At this point, the defense moved for a mistrial on the basis of jury misconduct based on the note regarding the juror with marital problems and a report that the foreman had isolated the same juror from the rest of the jury and had been "haranguing him." This motion was denied on the grounds that the length of the deliberations rebutted any presumption of prejudice and that the jurors had each affirmatively stated that there would be benefit in further

deliberations. Later that day, the foreman requested that the jury be supplied with a dictionary. The judge responded in writing, "The jury must decide the case on the evidence admitted in court and on the court's instructions." At approximately 6:50 p.m. on May 22, after deliberating for over 49 hours, the jury returned with a verdict of guilty of murder in the first degree. A subsequent motion for new trial on the basis of jury misconduct was denied. Thereafter, the defendant was sentenced to a maximum term of life imprisonment.

McCullum later filed a motion for vacation of sentence under CR 60(b), contending he was entitled to have probation considered as a sentencing alternative under RCW 9.95.200. The trial court denied this motion, entering an order stating in part, "[T]he legislature intended to remove all discretion from the trial court to impose probation following a conviction of the crime of first degree murder. . . ." McCullum appealed from this order which was entered June 8, 1979. McCullum's appeal from the denial of the postjudgment order was consolidated with the appeal from the conviction itself.

The critical question presented by this appeal is the effect of the court's inquiry into the jury's ability to reach a verdict or, stated more narrowly, whether the questioning of individual jury members during their deliberations amounts to impermissible coercion requiring a new trial.

The cases are legion which support the proposition that the right of jury trial includes the right of a jury to fail to agree and the right to have each juror reach his verdict uninfluenced by factors outside the evidence, the court's proper instructions, and the arguments of counsel. The most recent case dealing with this precise question is *State v. Boogaard,* 90 Wn.2d 733, 585 P.2d 789 (1978). *Boogaard* involved a prosecution for second degree theft resulting in a 2-day trial. Jury deliberations began in midafternoon. When no verdict had been returned by 9:30 p.m., the court summoned counsel to report to the courtroom, sent the bailiff to inquire how the jury stood numerically, and was

informed that the vote was 10 to 2. To facilitate decisions whether to permit the jury to continue until the next day, which was a holiday, or continue until a verdict was reached, which might be very late, the court called the jury into the courtroom. The *Boogaard* opinion, at page 735, described what occurred:

> In its presence [the judge] asked the foreman what the history of the vote had been and how long the vote had stood at each division. After asking the foreman if he thought the jury could reach a verdict in a half hour and receiving an affirmative reply, the judge asked each juror individually for his opinion on this question. All of the jurors except one answered that they believed a verdict could be reached in that length of time. The judge then instructed the jury to return to the jury room and continue its deliberations for a half hour.
>
> Thirty minutes later the jury sent word that it had reached a verdict.

The *Boogaard* court at page 736 then concluded that the judge's inquiry amounted to impermissible coercion because it "unavoidably tended to suggest to minority jurors that they should 'give in' for the sake of that goal which the judge obviously deemed desirable—namely, a verdict within a half hour."

In *State ex rel. Charles v. Bellingham Municipal Court,* 26 Wn. App. 144, 612 P.2d 427 (1980), the trial court had discharged the jury immediately upon the foreman's statement that it had been unable to arrive at a verdict. The record reflected no basis other than length of deliberation for the jury's discharge. We said at page 149:

> Although the trial court was not required to expressly find "manifest necessity," it is clear that the record must adequately disclose some basis upon which the court determines that the jury necessarily must be discharged.

From the *Boogaard* and *Bellingham* cases, therefore, it appears that the trial court must tread a narrow and dangerous course between unnecessarily interfering with the jury's deliberative function and making sufficient inquiry regarding their progress to determine some basis upon

which the jury may be properly discharged. If the judge inquires too often and too directly, his actions may amount to coercion which will require a new trial. On the other hand, if he precipitously discharges the jury without disclosing an adequate basis for such discharge, a retrial will be denied on the basis of double jeopardy.[1] A judge must further walk between the provisions of RCW 4.44.330, which states that the court may discharge a jury "after they have been kept together until it satisfactorily appears that there is no probability of their agreeing", and the provisions of CrR 6.15(f)(2), which states,

> After jury deliberations have begun, the court shall not instruct the jury in such a way as to suggest the need for agreement, the consequences of no agreement, or the length of time a jury will be required to deliberate.

The difficult decision of whether to discharge a jury in a particular case may be made easier by cautious inquiry with the accused and counsel present. The American Bar Association's standards for determining whether to discharge a jury state that "[t]he jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement." *ABA Standards Relating to Trial by Jury* § 5.4(c) (Approved Draft 1968). Commentary to this section suggests, at page 157, that "[o]ne way of making this determination is through questioning of the jurors." Some jurisdictions explicitly favor such questioning; none have forbidden it. The ABA commentary reflects the rule in California that,

> Ordinarily the trial judge should not discharge a jury on the ground that there is no reasonable probability that the jury can agree without questioning the jurors individually as to such probability.

---

[1] Our Supreme Court stated in *State v. Connors*, 59 Wn.2d 879, 371 P.2d 541 (1962), at page 883, "where . . . a jury has been impaneled and sworn to try the cause, the defendant has the right to have his case determined by that jury; and a discharge of that jury, without his consent, has the same effect as an acquittal, unless such discharge was necessary in the interest of the proper administration of public justice." (Footnote omitted.)

*Paulson v. Superior Court,* 58 Cal. 2d 1, 7, 372 P.2d 641, 22 Cal. Rptr. 649 (1962). The failure of the trial judge to inquire of the individual juror's ability to reach a verdict has been held by the Alaska Supreme Court to be a factor in determining whether the judge discharged the jury prematurely. *Koehler v. Alaska,* 519 P.2d 442 (Alaska 1974). The United States Court of Appeals for the Fourth Circuit has stated:

> While the length of deliberations is a relevant factor [in determining whether to discharge a jury], the more important consideration is whether there is a possibility that the jury can reach a verdict within a reasonable time. *The most reliable source as to this information is the jury itself.*

(Italics ours.) *United States v. Lansdown,* 460 F.2d 164, 169 (4th Cir. 1972).

It is important to note that the *Boogaard* decision did not forbid the practice followed by the trial judge in the instant case. The court stated that although

> [o]rdinarily no inquiry regarding jury proceedings is necessary . . .
>
> We are not prepared to say that a trial judge . . . can make no inquiry at all regarding the progress of the deliberations.

*Boogaard,* at 739. While clearly the jury should not be pressured by the judge into making a decision, the court in *Boogaard* narrowed its ruling by stating at page 739:

> Here the judge was first advised of the numerical division by the bailiff, who had been sent to inquire of the foreman. Had he confined his inquiry to that procedure, we would find it difficult to say that he exercised undue influence upon the jury. But when he called the jury into the courtroom, asked the foreman to disclose the history of the vote, asked for his opinion on the probability of agreement *within a half hour,* and then inquired of each juror whether or not he believed a verdict could be reached in that length of time, it was inevitable that the minority jurors should feel the pressure of judicial influence.

There are factual distinctions between what occurred in the case at bar and the direct pressure found impermissible in *Boogaard.* In *Boogaard,* the inquiry suggested to the minority jurors that they should yield in order to reach a verdict within a half hour; here, the trial judge may have departed from sound procedure by asking the individual jurors whether there would be benefit in further deliberation, but he did not disclose nor inquire into the numerical division, the history of the vote, or suggest any time limitation on further jury deliberations. As the *Boogaard* court observed at page 740,

> The polling of the jurors upon a question involving their deliberations threatens the prospect of a verdict free from outside influence.

It is difficult to see, however, how the simple inquiry in the instant case in any way affected any juror's freedom to vote his or her conscience. It must also be noted that the jury did not return a verdict for approximately 3 1/2 hours following the judge's individual questioning, unlike *Boogaard* in which a verdict was returned a half hour following the court's inquiry. The instant case is distinguishable also from *Iverson v. Pacific Am. Fisheries,* 73 Wn.2d 973, 442 P.2d 243 (1968), wherein the jury returned a verdict 10 minutes after the court instructed the jury to attempt to agree and reach a verdict without giving up their true convictions.

Further, the issue of jury coercion was not raised before the trial court by motion for mistrial. Indeed, according to remarks of the trial judge on the record, defense counsel approved the questions and form of the questions put to the jury. McCullum does not dispute this statement in his appeal.

Coming just minutes after the jury's note to him about their numerical division, the judge's question to individual jury members was a helpful, perhaps necessary, means to determine if the jury was hopelessly deadlocked. The neutrally worded question did not constitute judicial coercion. The motion for a new trial was properly denied.

The second issue in this consolidated appeal is whether a trial court has discretion pursuant to RCW 9A.32.040(3) to grant probation to one convicted of first degree murder.[2] McCullum's motion to vacate the sentence was based on the argument that RCW 9.95.200 *et seq.*, gave the sentencing judge discretion to grant probation to one convicted of "any crime" including first degree murder, and because such discretion was not exercised as to him, the sentence ought to be vacated. The trial court's order denying McCullum's motion states in part:

> [H]aving examined RCW 9A.32.030, RCW 9A.32.040, RCW 9.95.200 *et seq.*, and the court finding that the legislative intent is to proscribe [*sic*] a penalty more severe for murder 1 than other felonies, and further that the legislature intended to remove all discretion from the trial court to impose probation following a conviction for the crime of first degree murder, . . .
>
> The defendant's motion to vacate the sentence previously imposed is denied.

The pertinent language of RCW 9A.32.040 provides:

> Notwithstanding RCW 9A.32.030(2), any person convicted of the crime of murder in the first degree shall be sentenced as follows:
>
> . . .
>
> (3) In all other convictions for first degree murder, the sentence shall be life imprisonment.

RCW 9.95.200 states in part:

> After conviction by plea or verdict of guilty of any crime, the court upon application or its own motion, may summarily grant or deny probation, . . .

Appellant argues that because subsection (2) of RCW 9A.32.040 includes mandatory language prohibiting both the court and the parole board from ever releasing a person

---

[2]The statute authorizing probation differs in many respects from RCW 9.92-.060 which permits suspension of a sentence for a person convicted of any crime, "except murder, burglary in the first degree, arson in the first degree, robbery, carnal knowledge of a female child under the age of ten years, or rape" *See State v. Osborn*, 87 Wn.2d 161, 550 P.2d 513 (1976); *State v. Davis*, 56 Wn.2d 729, 355 P.2d 344 (1960).

sentenced to life imprisonment for aggravated first degree murder, the legislature must have intended to permit consideration of probation when sentencing a person convicted of first degree murder not involving aggravating circumstances, in view of the absence of a specific prohibition in subsection (3).[3]

 It is of greater significance that the sentencing statute for murder in the first degree, RCW 9A.32.040, uses the mandatory language, "shall be sentenced," and then states, "the sentence shall be life imprisonment." Because RCW 9A.32.040 is exclusive in using the unique word "sentenced" rather than "punished," we conclude that this is a special sentencing law, and because of its unique and special language, it prevails over the general language of the probation statute, RCW 9.95.200 *et seq.* Consequently, a sentencing judge is precluded from considering probation in sentencing one convicted of murder in the first degree.

Judgment affirmed.

WILLIAMS and ANDERSEN, JJ., concur.

Reconsideration denied April 1, 1981.

Review granted by Supreme Court June 12, 1981.

---

[3] RCW 9A.32.040(2) states,

"(2) If, pursuant to a special sentencing proceeding held under RCW 10.94-.020, the jury finds that there are one or more aggravating circumstances but fails to find that there are not sufficient mitigating circumstances to merit leniency, or the jury answers in the negative either of the special questions submitted pursuant to RCW 10.94.020(10), the sentence shall be life imprisonment without possibility of release or parole. A person sentenced to life imprisonment under this subsection shall not have that sentence suspended, deferred, or commuted by any judicial officer, and the board of prison terms and paroles shall never parole a prisoner nor reduce the period of confinement. The convicted person shall not be released as a result of any type of good time calculation nor shall the department of social and health services permit the convicted person to participate in any temporary release or furlough program;"