[No. 13219-6-III.   Division Three.   February 28, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. EARL STEVEN LEE, *Appellant*.

*Hugh M. Spall, Jr.,* for appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Bruce Hanify, Deputy,* for respondent.

SCHULTHEIS, J. — After jury trial, Earl Lee was convicted of second degree theft. He contends: (1) the evidence was insufficient to support a conviction for either theft by taking or theft by deception; (2) the court erred in failing to give a unanimity instruction requiring the jury to agree on the victim of the theft; and (3) the court mishandled the jury after it announced it was deadlocked.[1] We affirm.

Guy Hanson inherited real estate located on North 7th Street in Yakima from his deceased mother. The property consisted of two houses on a lot, one small and the other larger, both of which had been vacant for several years. Both had fallen into a state of disrepair and been vandalized. Mr. Hanson listed the property for sale.

---

[1]The State has filed a notice of cross appeal on the sentence imposed. However, the State has not argued the issue in its brief; thus, it is considered waived. *Smith v. King,* 106 Wn.2d 443, 451, 722 P.2d 796 (1986).

On June 18, 1992, Mr. Lee made an offer which Mr. Hanson accepted. Mr. Lee was to take possession upon closing, which was scheduled for July 10. One problem was the property's insurability. Mr. Lee was contractually obligated to provide evidence of insurance to protect Mr. Hanson's vendor interest, but it seemed clear it would be impossible to obtain insurance given the houses' state of disrepair. Mr. Lee offered to make repairs prior to closing to facilitate securing coverage. Mr. Lee's father and others performed various repairs. At trial, Mr. Hanson denied giving Mr. Lee early possession for any reason. Several days before the time set for closing, Mr. Hanson visited the property to retrieve items he had stored there. He found the small house repainted and its broken windows replaced. He also found the house occupied by Victor Valenzuela and Lucilia Dominguez. Mr. Valenzuela advised Mr. Hanson they were renting from Mr. Lee. Mr. Lee failed to appear for closing and the transaction was aborted.

Mr. Valenzuela and Ms. Dominguez were burned out of their apartment on June 22, 1992. The American Red Cross offered to provide emergency aid in the form of rent payments. As a condition of providing assistance, a tenant was required to obtain a certification from the landlord setting forth the terms of the rental agreement. On June 24, 1992, Mr. Lee completed such a form and listed the 7th Street residence as the subject of his rental agreement with the Valenzuelas.[2] This form was rejected because Mr. Lee required terms inconsistent with Red Cross policy. A second form was prepared and signed by one of Mr. Lee's employees on his behalf. Mr. Lee also signed a disbursing order certifying he was renting the 7th Street residence to Ms. Dominguez. The evidence was in conflict over whether Mr. Lee in fact in-

---

[2]For reasons not in the record, the State filed an amended information deleting Mr. Valenzuela as a potential victim thus leaving only Ms. Dominguez and the Red Cross. This may be because all of the Red Cross paperwork was in Ms. Dominguez' name. Or it may be because both Mr. Valenzuela and Ms. Dominguez tended to use each other's last names interchangeably. The feature is immaterial. Mr. Valenzuela and Ms. Dominguez are each in the same position and are referred to collectively as the Valenzuelas.

tended to rent this property or some other property. In any event, the Valenzuelas remained in residence from July 5, 1992, forward and Mr. Lee received a check drawn by the Red Cross on June 29, 1992, for $700 and cashed it.

Mr. Lee was charged in the alternative with one count of second degree theft by taking or theft by deception and one count of first degree trespass. He was charged in the alternative with taking property from or deceiving either the Red Cross or Ms. Dominguez or both. The jury reported it was deadlocked. The court inquired of the panel members individually. Nine jurors advised they considered deliberations deadlocked on both counts. Three thought they might be able to reach a verdict on one count. The court denied Mr. Lee's motion for a mistrial and sent the jury home for the evening with instructions to return the following day for further deliberations. At least one juror reportedly felt coerced into returning a guilty verdict notwithstanding her reasonable doubt reservations and gave defense counsel an affidavit to that effect. Mr. Lee was convicted of theft and acquitted of trespass.

Mr. Lee contends there is no evidence from which the jury could have found he entertained the requisite intent to deprive the true owner of the funds. He urges he may have intended to close and only later, after title to the money had passed to him, decided against closing. Mr. Lee had no right to convey a tenancy in property in which he himself had no possessory interest. He had no right to receive money for the purported conveyance.

Mr. Lee contends he may have had pure intentions on July 5 when the Valenzuelas took possession. However, on July 10 he failed to attend closing. Nothing in the record suggests he offered to rescind the transaction and return the rent money. He kept it, including a damage deposit which should have been placed in escrow pursuant to the landlord tenant act. The Valenzuelas found themselves facing possible eviction at the hands of the true owner, Mr. Hanson. As matters turned out, they were not evicted and eventually purchased the property from Mr. Hanson. Whatever Mr.

Lee's state of mind upon entering into the rental agreement, he placed the Valenzuelas in peril by purporting to convey a leasehold in property he did not own and then retained the money after he knew he did not own it. The real issue is not whether Mr. Lee obtained property from someone through deceptive means, but from whom he obtained it.

Mr. Lee contends the State charged two offenses in the same information and that he had a right to a unanimity instruction. We agree, but find the failure to give such an instruction harmless. The amended information charged as follows:

> In that you, on or about June 29, 1992, in Yakima County, Washington, did wrongfully obtain or exert unauthorized control and/or did, by color or aid of deception obtain control over property, of a value in excess of $250.00, belonging to Lucilia Dominguez and/or the American Red Cross, with intent to deprive the same of such property;

■ The State urges this is an "alternative means of commission" case and as such, an expression of jury unanimity is not required when the evidence supports all potential alternative means. *State v. Ortega-Martinez*, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). In one sense, this is an alternative means case because the information charges a single count of theft alleging two alternative modes of commission. That is not objectionable. *State v. Southard*, 49 Wn. App. 59, 62, 741 P.2d 78 (1987) (RCW 9A.56.020 defines single offense with multiple possible modes of commission). However, this is also an alternative crimes case because there were two potential victims and Mr. Lee had a right to know who his victim was. *State v. Stephens*, 93 Wn.2d 186, 607 P.2d 304 (1980). In *Stephens*, two men became embroiled in an altercation with a homeowner. The homeowner produced a shotgun and fired one time, missing the men, but striking their vehicle. The State charged one count of assault against both victims. The trial court instructed the jury that their verdict could be sustained if *either* victim were the target of the assault. Six jurors could have found one man was the target and six jurors could have found the other was. *Stephens* found this unacceptable:

The State's citation of *State v. Arndt*, 87 Wn.2d 374, 553 P.2d 1328 (1976) is inapposite. In *Arndt*, we held that when alternative means of committing a single crime are charged and substantial evidence exists to support each alternative, jurors need not be unanimous as to the mode of commission. Unlike *Arndt*, the instant case involved one mode of commission under RCW 9A.36.020(1)(c). Further, instruction No. 6A related to the *fact* of whether the charged crime had been committed, not to alternative modes of commission. The instruction, in effect, split the action into two separate crimes[.]

*Stephens*, at 190.

Here, the jury had before it the question of *how* the crime was committed, as well as the question of *whether* it was committed. In order to determine that, the jury must necessarily have determined who the victim was. *Stephens*, at 190. Mr. Lee had a right to know whether it was the Red Cross, Ms. Dominguez, or both, and he had a right to a unanimous verdict on the question.

█ The remaining issue is whether the error was harmless. Error involving a constitutional right is harmless only if an appellate court can "declare a belief that it was harmless beyond a reasonable doubt.' " *Stephens*, at 191 (quoting *State v. Burri*, 87 Wn.2d 175, 181, 182, 550 P.2d 507 (1976)). "A harmless error is an error which is trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case." (Italics omitted.) *Stephens*, at 190 (quoting *State v. Wanrow*, 88 Wn.2d 221, 237, 559 P.2d 548 (1977)). The core issue for the jury was whether Mr. Lee formed an intent to deprive anyone of the $700. That much appears from a question the jury submitted to the court.[3] Ultimately, the jury found an intent to deprive and it was only marginally relevant who was deprived. We fail to see how Mr. Lee was prejudiced in dealing with the evidence or arguing to the jury. The State did not urge in closing argument that anyone other than the Red Cross had been victimized. In essence, the State made an informal election.

---

[3]The question reads as follows: "Instruction #8. *Please provide a more detailed explanation of of* [sic] *this portion of the law. (Please define 'intent to deprive').*" The trial court declined to instruct further and referred the jury back to the instructions previously given.

Mr. Lee next contends the trial court created a coercive atmosphere in questioning the jury after the foreman announced it was deadlocked. At the end of the business day after trial concluded, the judge directed the bailiff to find out whether the jury wished to continue deliberations during the evening or return the following morning. Four jurors volunteered they appeared to be deadlocked. The foreman sent a note out confirming this. The court asked the foreman in open court but outside the presence of the other jurors whether "further deliberations, either this evening or beginning tomorrow morning, would be beneficial". He thought not. The court then brought the jury in and interviewed each member outside the presence of the others, asking two questions: "Do you think that further deliberations either today or tomorrow would be beneficial?"; and "Is there a reasonable probability of the jury reaching an agreement on one or both counts?" Nine jurors thought it unlikely that further deliberations would be useful and three thought a verdict might be possible on one count. The court directed the jury to return the following morning for further deliberations.

Mr. Lee relies on *State v. Boogaard*, 90 Wn.2d 733, 585 P.2d 789 (1978) for the premise that this procedure was unduly coercive and suggested to the jury that it must return a verdict. The trial court did not suggest a desired outcome, nor nullify its prior instructions on the duty to deliberate. On the contrary, the jury was advised in writing that "All of the previous instructions of the court still apply, and you must continue to follow them." Unlike the situation in *Boogaard*, no time constraints were intimated. *Boogaard*, at 739-40. The court in colloquy observed that "Judges cannot in any way give any idea to the jurors that the judge is forcing them to reach a verdict." The court carefully thought its way through the process it intended to utilize to determine if the jury really was deadlocked. The court demonstrated commendable caution in its efforts to avoid tainting the jury by suggesting it must reach a verdict.

We have carefully reviewed Mr. Lee's pro se brief which raises various discrepancies in the evidence. Ques-

126

of credibility are solely for the jury to determine and are not reviewable on appeal.

Affirmed.

SWEENEY, A.C.J., and MUNSON, J., concur.

Review granted at 126 Wn.2d 1022 (1995).