IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30232-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT LEE WIDRIG, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Robert Widrig's ex-wife's home was burglarized while she was out of town with her and Mr. Widrig's sons, and a jury found that he was responsible. He was convicted of residential burglary, second degree theft, and a dozen counts of second degree animal cruelty for releasing his ex-wife's and sons' show rabbits from their pens. He appeals, challenging the sufficiency of the evidence. He also contends that the trial court erred in refusing to declare a mistrial after it discovered that a handbook of Washington court rules was inadvertently left in the jury room during the jurors' deliberations.

The evidence was sufficient to support the jury's verdict and the record supports the trial court's conclusion that Mr. Widrig has failed to demonstrate any prejudice from the presence of the rule book in the jury room. We affirm.

FACTS AND PROCEDURAL BACKGROUND

Katrina Riexinger and Robert Widrig were married for almost 30 years. Late in the marriage—in 2005—Mr. Widrig moved to Las Vegas to work construction because the money was good. Initially, he returned home to Cle Elum for three- to four-day visits at a time. Trips home became increasingly infrequent and he eventually quit returning at all, having become romantically involved with Tamara Rowland, whom he met in Las Vegas.

By the time Ms. Riexinger filed for divorce in early 2007, three of the couple's sons were adults; Ms. Riexinger was appointed the primary residential parent of their youngest son. In the decree of dissolution, the trial court awarded Ms. Riexinger the family home while Mr. Widrig was awarded his tools and a number of other items of personal property.

The decree of dissolution was entered on September 15, 2008 and ordered Mr. Widrig to pick up any personal property awarded him that remained at the family home by October 15. By the time of entry of the decree, Mr. Widrig had moved back to the Pacific Northwest and was living on property owned by his parents in North Bend. Following entry of the decree, Mr. Widrig gave Ms. Riexinger a list of items he wanted from the home. He arranged a date to pick them up in late September, but then canceled.

After he canceled the planned pick up of property and despite the deadline imposed by the decree, Ms. Riexinger decided to go forward with a trip to Disneyland

2

that she had planned with her sons, leaving on October 5 and expecting to return on October 13. Her parents agreed to watch her house and feed the family's cats and a dozen Netherland pedigree show rabbits that were raised as a hobby by Ms. Riexinger and the boys.

On October 10, Ms. Riexinger received a frantic call from her mother, Marilyn Riexinger, who had arrived with her husband at their daughter's house for the first of their customary twice-a-day house-sitting visits and discovered some of the family's outside cats indoors, and the rabbits all released from their pens and gone. Ms. Riexinger asked her mother to call the police. Cutting the vacation short, she began the drive back to Cle Elum.

Cle Elum police officer Jennifer Rogers responded to Marilyn Riexinger's report of a burglary and drove to the home, where Marilyn[1] and other family members were trying to find and capture the rabbits. Marilyn had not been able to determine how the burglar entered her daughter's home, but showed Officer Rogers around and said that at a minimum, her grandson's computer was missing. Marilyn told Officer Rogers that when she and her husband left the prior evening the rabbits were in their closed pens located in an outside shed; a light was on and music was playing in the shed, as usual. Marilyn and her husband had closed the shed door and latched it before they left. Upon arriving that

---

[1] We refer to Marilyn Riexinger by her first name to avoid confusion. We intend no disrespect.

3

morning, they found the shed door open, the lights and music off, each of the individual pens open and the rabbits missing. It would later be determined that an electrical cord that ran from the shed to a somewhat obscure outlet had been unplugged.

After completing her investigation at the house, Officer Rogers returned to the police station and was writing up her report when she was notified by a central dispatch agency for county law enforcement that Robert Widrig had just contacted the agency to request "civil stand by" at his ex-wife's home, so that he could go there and pick up his belongings. Report of Proceedings (RP) at 229. Officer Rogers called Mr. Widrig and explained that she had just returned from Ms. Riexinger's home after investigating a burglary. She considered Mr. Widrig a suspect and asked him his whereabouts for the prior 24 hours. Mr. Widrig told her that he had been in North Bend the entire time and had not been to his ex-wife's home in over a year. When the officer told him the rabbits had been released, suggesting a personal, malicious motive on the part of whoever committed the crime, Mr. Widrig stated that he did not know Ms. Riexinger and the boys still had rabbits and insisted that he had "no problem" with his ex-wife. RP at 233.

During the course of the conversation, Mr. Widrig told the officer that his mother could verify that he had been in North Bend. Officer Rogers was willing to speak with Ms. Widrig, so Mr. Widrig handed the phone to his mother. According to the officer's notes, he stated, while handing his mother the phone, "'[Y]ou can verify I was here last night and today, right?'" RP at 235. Ms. Widrig then told the officer that her son had

been at her home mowing the lawn from 11 a.m. to 3 or 3:30 p.m. the prior afternoon. She also told the officer that her son had gone to bed about 11 p.m. the night before but then corrected herself and said that he had been feeding his chickens at that time and had gone to bed later. Ms. Widrig did not attempt to account for her son's whereabouts at any other time during her conversation with the officer.

After Ms. Riexinger returned to Cle Elum, Officer Rogers met with her and walked through the home again. Ms. Riexinger had noticed on her return that the family room window appeared to have been propped open and a ladder along the fence had been moved. Ms. Riexinger had by then determined that the only items missing other than the earlier-reported laptop and the rabbits were a new Coleman lantern and a ziplock bag that contained her wedding ring and other jewelry she had received from Mr. Widrig. She kept the bag of jewelry in a dresser drawer in her bedroom. The property missing was valued at $14,000. Among items pointed out to Officer Rogers that had been left untouched in the burglary were a flat screen TV, DVDs, video games and systems, and a box of Ms. Riexinger's other jewelry.

By the time Ms. Riexinger returned to Cle Elum, 9 of the 12 rabbits had been captured; the other 3 were never found. One of the rabbits had a broken back and all of them were very stressed. Two of the rabbits that had been found never recovered, and died.

5

The next development in the case occurred a little over a month later, when Officer Rogers received a "pawn hit." RP at 246. She had asked the King County Sheriff's Office to notify her in the event any jewelry was reported by pawn businesses in the county to have been pawned by Mr. Widrig or Ms. Rowland, who had moved to North Bend and was living with Mr. Widrig. Two rings pawned at an Auburn pawn shop by Ms. Rowland proved to be Ms. Riexinger's wedding ring and anniversary ring.

Ms. Rowland had provided the pawn shop with a false address and Officer Rogers was unable to locate her there, but she later contacted Ms. Rowland at Mr. Widrig's mother's North Bend home. Ms. Rowland admitted that she had traveled to the Auburn pawn shop with Mr. Widrig and pawned the rings at his request, after Mr. Widrig claimed to have forgotten his identification. Mr. Widrig was thereafter charged with residential burglary, second degree theft, and the animal cruelty counts.

The charges against Mr. Widrig proceeded to trial in May 2011. Mr. Widrig never challenged that the burglary, theft, and animal cruelty had occurred, but denied that he had anything to do with them. He did not testify. His mother's testimony supported the likelihood that he was at her home during most if not all of the time frame in which the crimes occurred. His mother also claimed that her son gave her rings and other property for safekeeping in 2007 when he first returned from Las Vegas, and that she understood it to be property he had picked up from Ms. Riexinger upon his initial return. Ms. Widrig

testified, as did Ms. Rowland, that Ms. Widrig gave her son a box of items to pawn, in which the rings were included.

Evidently the jury did not believe the defense witnesses. It found Mr. Widrig guilty on all counts.

The day after the jury returned its verdict, the court wrote to the lawyers to report the following development:

> After court adjourned last night I left the bench, went to chambers and removed my robe, then proceeded into the jury room to help the bailiff clean up the room. Upon entering the jury room I immediately noticed a book on the table, Washington Court Rules, Volume I—State. I asked the bailiff if he'd placed that book in the jury room and he said no, the book was there when he went in to clean up. At this point I am unaware of how or when that book was introduced into the jury room.
> I placed my initials and the date (5/11/11) in ink on the book, and have it available for inspection at your convenience. I have reviewed *State v. Fry*, 153 Wn. App. 235 (2009) and am willing to call the jurors back to court, place them on the witness stand individually, place them under oath, and allow you to ask each of them whatever questions you may have about this issue so that you may develop a record of what impact this book may have had upon their deliberations.

Clerk's Papers (CP) at 166.

The court conducted a hearing at which each juror was questioned about any use made, or reliance on information found in the rules book. A number of jurors testified that they saw the book in the jury room but some had not seen it. Several "thumbed through" the book. RP at 385, 392, 414. Only a couple had attempted to use the book, but unsuccessfully; Juror 4 testified that he tried to look for things for criminal law, but

7

"it was just so big." RP at 403. Juror 12 testified that she attempted to look up a definition, but was unsuccessful. Every juror was asked whether the book played a role in deliberations. Each responded that it had not.

After questioning of the jurors was completed Mr. Widrig moved for a mistrial, arguing that the jurors had used extraneous material in reaching their verdict. The court denied the motion finding that "the court is not convinced that jurors used the book during deliberations or that the mere presence of the book could influence the verdict and prejudice the defendant." CP at 182. Mr. Widrig appeals.

ANALYSIS

I

Mr. Widrig first contends that while the State presented sufficient evidence that crimes were committed, it failed to prove that he was the individual that committed them. He characterizes the State's evidence as "circumstantial at best" and emphasizes that he had "an alibi backed up with documentary evidence from his employer and had plausible explanations for how he came to possess the wedding ring and anniversary band, corroborated by his mother." Br. of Appellant at 11.

In reviewing a claim of insufficient evidence, we view evidence in the light most favorable to the State in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Brockob*, 159 Wn.2d 311, 336, 150 P.3d 59 (2006). We defer to the trier of fact when it comes to

8

conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). A conviction will be reversed only when no rational trier of fact could have found that the State proved all of the elements of the crime beyond a reasonable doubt. *State v. Smith*, 155 Wn.2d 496, 501, 120 P.3d 559 (2005).

Mr. Widrig's explanation of how he came to possess the wedding band and anniversary ring might have been backed up by his mother but it was clearly contested by Ms. Riexinger, who testified that she had never placed her wedding or anniversary rings in boxes of clothing and possessions that she packed and provided to Mr. Widrig upon his return from Las Vegas. She testified unequivocally that she kept the rings in her bedroom dresser drawer until they disappeared in early October 2008, during her trip to Disneyland. We defer to the trier of fact, which believed Ms. Riexinger.

There was some direct evidence and a significant amount of circumstantial evidence of Mr. Widrig's responsibility for the crimes. Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). There was direct evidence that Mr. Widrig possessed the rings that were taken from the house in early October and were thereafter pawned by his girl friend. There was circumstantial evidence that Mr. Widrig had been having financial problems and of malice, as an additional motive.

9

Mr. Widrig had been laid off for four to five months at the time of the crime and he and Ms. Rowland were getting by financially by having yard sales, making and selling crafts, and pawning tools or trinkets he would get from his parents. Ms. Rowland characterized him as being "sad" and "bummed out" and testified that both of them were feeling desperate. RP at 156.

The crimes were atypical property crimes. Officer Rogers testified that electronics, readily accessible jewelry, and other items that would ordinarily be the first to be taken were left behind. The acts of unplugging power to the shed in which the rabbits were penned and releasing and removing them from their pens defy explanation as the acts of a stranger. Officer Rogers suggested it was a suspicious coincidence that Mr. Widrig called to request "civil stand by" to go to his ex-wife's home to pick up his belongings so shortly after the suspected time of the burglary.

The acts suggested the involvement of someone with personal malice and familiarity with the rabbits' housing and vulnerability. There was testimony at trial that even with the pen doors open, these docile show rabbits were unlikely to jump out of their pens and were likely lifted out of their pens and placed outside. As to possible malice, Mr. Widrig was $50,000 in arrears for child support and according to Ms. Rowland "felt bad" because he "hadn't seen his kids [and] didn't have money to give them more and he couldn't talk to them unless Katrina said." RP at 157. Meanwhile, his ex-wife had ongoing contact with their sons and was taking them to Disneyland.

10

As to Mr. Widrig's alibi, even if the jury believed his mother, she could not vouch for his whereabouts between 12 a.m. and 6:30 a.m. on October 10. Based on Marilyn Riexinger's and her husband's routine for feeding and watering their daughter's animals, the crime occurred somewhere between 6 p.m. or so on October 9 and midmorning on October 10. The jury heard that Mr. Widrig lived within an hour of Ms. Riexinger's home. There was an ample window within which he could have committed the crimes.

The evidence was sufficient for a reasonable jury to find Mr. Widrig guilty.

## II

Mr. Widrig's second assignment of error is to the trial court's denial of his motion for a mistrial based on the review by some jurors of the book of court rules. The court rules book is a compendium of dozens of sets of rules, principles, and standards, the vast majority of which would have no conceivable application to Mr. Widrig's trial.

The right to a trial by jury includes "the right to have each juror reach [a] verdict uninfluenced by factors outside the evidence." *State v. Boogaard*, 90 Wn.2d 733, 736, 585 P.2d 789 (1978). A criminal defendant's constitutional right to an impartial jury is denied when the jury considers extraneous material in its deliberations. *Turner v. Louisiana*, 379 U.S. 466, 472, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965). A trial court may grant a defendant's motion for new trial if it "affirmatively appears that a substantial right of the defendant was materially affected" by the jury's receipt of "any evidence, paper,

document or book not allowed by the court." CrR 7.5(a)(1); *State v. Pete*, 152 Wn.2d 546, 552, 98 P.3d 803 (2004).

A new trial must be granted unless it can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict. *State v. Briggs*, 55 Wn. App. 44, 55-56, 776 P.2d 1347 (1989) (quoting *United States v. Bagley*, 641 F.2d 1235, 1242 (9th Cir. 1981) (Fletcher, J., concurring in part and dissenting in part)). The defendant must demonstrate reasonable grounds to believe that he or she has been prejudiced or, at a minimum, a probability of prejudice. *State v. Lemieux*, 75 Wn.2d 89, 91, 448 P.2d 943 (1968); *State v. Hicks*, 41 Wn. App. 303, 312, 704 P.2d 1206 (1985) (showing of "probability of prejudice" will suffice). The inquiry into whether a defendant has been prejudiced is an objective one and the State need not delve into the actual effect of the extraneous material. *State v. Boling*, 131 Wn. App. 329, 332, 127 P.3d 740 (2006). Where it is not clear what extraneous material might have been used, or how, it is reasonable for the trial court to conduct a hearing at which jurors can be questioned, as was done here. *See State v. Fry*, 153 Wn. App. 235, 220 P.3d 1245 (2009) (hearing conducted to question juror about her use of a dictionary).

In this case, the court rules book was clearly extraneous; it was not admitted into evidence or provided to the jury by the court. But Mr. Widrig has not shown how a few jurors' review of the book could possibly have adversely influenced the resolution of his case. In light of the myriad contents of the many hundred page long book, the prospect

12

of the jurors locating something they would perceive as relevant to their deliberations was remote. Their testimony as to what they reviewed and the inconsequential information from the book that might have been shared confirmed that they found nothing relevant. There is no reasonable doubt that access to the book did not contribute to the verdict.

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Brown, J.