213 P.3d 54 (2009)
STATE of Washington, Respondent,
v.
Tyrone Dentyroll FORD, Appellant.
No. 37089-1-II.
Court of Appeals of Washington, Division 2.
August 11, 2009.
*55 Lisa Elizabeth Tabbut, Attorney at Law, Longview, WA, for Appellant.
*56 Alan Edward Harvey, Clark County Prosecutors Office, Michael C. Kinnie Attorney at Law Vancouver, WA, for Respondent.
BRIDGEWATER, P.J.
¶ 1 Tyrone Dentyroll Ford appeals his convictions for second and third degree child rape. We reverse and remand Ford's conviction on count I for second degree rape of a child and affirm Ford's conviction on count II for third degree rape of a child. Because we reverse count I, we vacate the lifetime no-contact order (NCO). But because we reverse on count I, we do not reach Ford's arguments on ineffective assistance of counsel and remaining community custody conditions.

FACTS
¶ 2 During August and September 2006, Tyrone Ford had sex on two occasions with a minor, L.K.[1] The State charged Ford with second degree child rape (count I) and third degree child rape (count II). The different degrees reflected that L.K. was 13 years old during the first incident and 14 years old during the second incident.
¶ 3 During voir dire, the State asked the prospective jurors if anyone was concerned about his or her ability to be fair and impartial. Several jurors raised their hands, including Wiggs and Siciliana. Siciliana stated that as a prior victim of sexual abuse, she might be "slightly biased." RP (Aug. 27, 2007) at 39. Similarly, Wiggs stated that her prior experience as a victim of sexual abuse would affect her ability to be fair and impartial. Following further statements regarding their feelings about abuse allegations, the trial court struck both Wiggs and Siciliana for cause.
¶ 4 After L.K. testified, the State sought to amend the information to conform to the proof because L.K. provided more exact information regarding the incident dates during her trial testimony. Specifically, the State sought to change the first incident date from between September 1, 2006 and September 15, 2006 to on or about August 8. The State also proposed changing the second incident date from September 16 to September 17. Over objection, the trial court granted the State's motion to file the amended information. The trial court held that filing the amended information would not change the substantive facts of the case.
¶ 5 After the parties rested, the jury retired to deliberate at 7:47 p.m. The next day, the jury returned its verdict at 2:01 p.m. The trial court asked the presiding juror if the jury had reached a unanimous verdict, and the presiding juror responded, "Yes." IV RP at 389-90. The trial court began to read the verdict form, stating that the jury found Ford guilty of third degree child rape on count II. Then the trial court paused to review the documents and called for a sidebar.
¶ 6 A bench conference occurred off the record.[2] The trial court stated, "I'm sending the jury back to the jury room. Verdict form No. 1 is completely blank. It must be filled in," IV RP at 390, adding, "The defendant is remanded into custody at this time." IV RP at 390. Next, the trial court stated, "I believe we have just a momentary delay[.] I think they just forgot to fill out the form." IV RP at 390.
¶ 7 After the brief recess, the trial court stated:
I'm of the opinion that one of two things has happened. They have forgotten to fill in the form. Or in the alternative, they have reached a decision that either means they were deadlocked on Count One or that they reached a not guilty finding on Count One.
I'm inclined to [ ] tell them if they have a question to write the question out and submit it to us. Is that agreeable?
IV RP at 391.
¶ 8 Both parties agreed. The jurors did not receive this communication, however, because before the trial court could deliver it, the jury was already coming back from the jury room. The trial court asked the presiding juror if the jury had reached a verdict on *57 count I, and the presiding juror responded, "Yes." IV RP at 391-92. Then the trial court read the verdict form, stating that the jury unanimously found Ford guilty of second degree child rape, as charged in count I.
¶ 9 After trial, but before sentencing, the trial court granted Ford's request for a new attorney who would move for a new trial based on his current counsel's ineffective assistance. The trial court appointed another attorney to represent Ford. That attorney refused Ford's request to move for a new trial and instead sent a letter to the trial court in which he explained that he would not move for a new trial because he did not have any credible evidence to support Ford's claim that his trial counsel failed to notify Ford until after the trial had concluded about a plea offer that Ford would have taken.[3] Apparently, the first attorney told the newly appointed attorney that he had notified Ford about the plea offer before the end of the trial, and the newly appointed attorney did not know who to believe. The record contains no other information about this plea offer or any other pretrial proceeding.
¶ 10 On count I (second degree child rape), the trial court imposed a minimum sentence of 126 months and a maximum sentence of life in prison. On count II (third degree child rape), the trial court ordered Ford to serve a concurrent 34-month sentence.
¶ 11 The trial court ordered community custody on count I "for any period of time the Defendant is released from total confinement before the expiration of the maximum sentence." CP at 51. The trial court also ordered community custody on count II for a period of 26-34 months, noting that the combined total time in community custody could not exceed the 60-month statutory maximum for third degree child rape.
¶ 12 These community custody conditions included prohibitions against (1) possessing alcohol; (2) being in places where alcoholic beverages are the primary sale item; (3) possessing paraphernalia for using or ingesting legal or illegal controlled substances; and (4) possessing, using, or owning deadly weapons as defined by a community corrections officer. The community custody conditions required Ford to take a medication called "antabuse" if instructed to do so by a community corrections officer. CP at 61. Additionally, the trial court signed a lifetime no-contact order to restrain Ford from L.K.

ANALYSIS

I. Jury's Failure to Complete Verdict Form on Count I
¶ 13 First, Ford argues that the trial court erred in coercing the jury to return a verdict on count I (second-degree child rape) in violation of CrR 6.15. Ford asserts that although the written jury instructions advised the jury that it need not reach a unanimous verdict, the trial judge orally advised the jury that it must reach a verdict and sent the jury back to the jury room for further deliberation. Although Ford did not object to this oral instruction during his jury trial, he raises it now on appeal, arguing that he is entitled to a new trial on this basis. We agree.
¶ 14 We may review an alleged error raised for the first time on appeal if it is a manifest error affecting a constitutional right. RAP 2.5(a)(3), State v. Walsh, 143 Wash.2d 1, 7, 17 P.3d 591 (2001). To raise such an issue on appeal, the defendant must identify a constitutional error and show how the alleged error actually affected the defendant's rights at trial. State v. Kirkman, 159 Wash.2d 918, 926-27, 155 P.3d 125 (2007). This showing of actual prejudice makes the error "`manifest,'" allowing appellate review. Kirkman, 159 Wash.2d at 927, 155 P.3d 125.
¶ 15 Because the trial court is in the best position to determine if an irregularity at trial caused prejudice, we review the decision to grant or to deny a mistrial for an abuse of discretion. State v. Weber, 99 *58 Wash.2d 158, 165-66, 659 P.2d 1102 (1983). An irregularity at trial is not prejudicial unless there is a reasonable probability that the trial's outcome would have differed if the error had not occurred. State v. Thomas, 150 Wash.2d 821, 871, 83 P.3d 970 (2004). In determining the effect of an irregularity at trial, we examine (1) its seriousness, (2) whether it involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it. State v. Bourgeois, 133 Wash.2d 389, 409, 945 P.2d 1120 (1997). We must decide whether the record reveals a substantial likelihood that the trial irregularity affected the jury verdict, thereby denying the defendant a fair trial. State v. Hicks, 41 Wash.App. 303, 313, 704 P.2d 1206 (1985) (citing State v. Davenport, 100 Wash.2d 757, 762-63, 675 P.2d 1213 (1984)). A "strong, affirmative showing of misconduct is necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank and free discussion of the evidence by the jury." State v. Balisok, 123 Wash.2d 114, 117-18, 866 P.2d 631 (1994); Br. of Resp't at 5.
¶ 16 Citing State v. Boogaard, 90 Wash.2d 733, 585 P.2d 789 (1978), Ford argues that the trial court violated his right to a fair trial by coercing the jury to return a verdict on count I, contrary to CrR 6.15(f)(2). CrR 6.15(f)(2) provides, "After jury deliberations have begun, the court shall not instruct the jury in such a way as to suggest the need for agreement, the consequences of no agreement, or the length of time a jury will be required to deliberate." This rule's purpose is to prevent judicial interference with the deliberative process. Boogaard, 90 Wash.2d at 736, 585 P.2d 789.
¶ 17 In Boogaard, a prosecution for second degree theft, the jury began deliberating in midafternoon and had not reached a verdict by 9:30 p.m. Boogaard, 90 Wash.2d at 735, 585 P.2d 789. Because it was getting late in the evening, the trial court called the jury to the courtroom and asked each juror whether he/she thought it was possible to reach a verdict in half an hour. Boogaard, 90 Wash.2d at 735, 585 P.2d 789. All but one of the jurors answered affirmatively, and the trial judge instructed the jury to return to the jury room and continue its deliberations for a half hour. Boogaard, 90 Wash.2d at 735, 585 P.2d 789. Thirty minutes later, the jury returned a guilty verdict. Boogaard, 90 Wash.2d at 735, 585 P.2d 789. After the trial court entered judgment on the verdict, Boogaard moved for a new trial, which the trial court denied. Boogaard, 90 Wash.2d at 735-36, 585 P.2d 789.
¶ 18 On appeal, the Washington State Supreme Court reversed the conviction and remanded, stating:
The questioning of individual jurors, with respect to each juror's opinion regarding the jury's ability to reach a verdict in a prescribed length of time, after the court was apprised of the history of the vote in the presence of the jurors, unavoidably tended to suggest to minority jurors that they should give in for the sake of the goal which the judge obviously deemed desirable  namely, a verdict within a half hour.
Boogaard, 90 Wash.2d at 736, 741, 585 P.2d 789 (internal quotation marks omitted).
¶ 19 Here, the trial court stated, "I'm sending the jury back to the jury room. Verdict form No. 1 is completely blank. It must be filled in." IV RP at 390. The trial court's instruction to the jury directly conflicted with the trial court's jury instructions, which provided that the jury need not reach unanimous agreement on each charge. Instead, the jury could only return guilty verdicts if it unanimously agreed. Put simply, nothing in the jury instructions here required the jury to render a verdict.
¶ 20 The dissent makes much of the short timeframe of the incident. The jury completed the form and then returned to the courtroom after only several minutes, allegedly supporting the argument that it had merely forgotten to fill in the sheet. But, it is equally possible that the jury walked back to the jury room, determined that it had already spent too much time deliberating, and any holdouts simply acquiesced rather than require the group to start over on count I. This is the same concern that the Boogaard court addressed. Boogaard, 90 Wash.2d at 736, 585 P.2d 789.
*59 ¶ 21 The trial court did not ask the jury to clarify whether it found Ford not guilty on form no. 1 or whether it was hung on the issue and openly speculated that either could be the case. The trial court did not ask the jury if it had simply overlooked filling in the verdict sheet. We simply cannot tell why the jury did not fill in the verdict form.
¶ 22 We note that several Washington cases have addressed blank verdict forms in cases involving lesser-included offenses but, so far, only in the context of double jeopardy challenges. See State v. Daniels, 160 Wash.2d 256, 156 P.3d 905 (2007); State v. Ervin, 158 Wash.2d 746, 147 P.3d 567 (2006). These cases indicate that a blank verdict form did not constitute an implied acquittal barring retrial on those charges. Daniels, 160 Wash.2d at 264, 156 P.3d 905; Ervin, 158 Wash.2d at 757, 758, 147 P.3d 567. The case here is distinguishable because the trial court specifically instructed the jury, after it had begun deliberations, that it must return a verdict and this case does not involve the lesserincluded-offense scenario.
¶ 23 We hold that under the facts of this case, it is substantially likely that the court's instruction affected the outcome of Ford's trial. We hold that this constitutes a manifest error affecting a constitutional right. It is also reversible error based on a violation of CrR 6.15(f)(2) and the same concerns the Boogaard court expressed.

II. Lifetime No-Contact Order
¶ 24 Next, Ford argues that the trial court erred in imposing a lifetime no-contact order with L.K. as a condition of his sentence. At the conclusion of Ford's jury trial, the jury found him guilty of second degree child rape (a class A felony) and third degree child rape (a class C felony). Ford assumes that the no-contact order applied to his class C felony.
As Ford notes in his briefing, although a lifetime no-contact order may be appropriate for class A felonies with a maximum term of life in prison, such orders cannot exceed the statutory maximum for the underlying offense. State v. Armendariz, 160 Wash.2d 106, 119-20, 156 P.3d 201 (2007). This provision must be vacated because we reverse count I and it is inapplicable to count II.

STATEMENT OF ADDITIONAL GROUNDS
¶ 25 In his SAG, Ford argues: (1) the trial court erred by allowing the State to amend the information; (2) the trial court allowed "expert-like" statements during voir dire, SAG at 11 (capitalization omitted); (3) his first counsel provided ineffective assistance; and (4) the cumulative error doctrine requires reversal. We have carefully reviewed each claim and hold that Ford's SAG arguments lack merit.
¶ 26 Regarding Ford's argument that the trial court erred by allowing the State to amend the information at trial, we find no error because the act of amending the dates did not change the substance of the offense or the degrees of the offenses.
¶ 27 Ford's argument that the "expert-like statements presented during voir dire violated [his] right to an impartial jury trial" also fails. SAG at 11 (capitalization omitted). Ford contends that because two prospective jurors (Wiggs and Siciliana) spoke directly about a child's incapability of lying and the importance of believing survivors, their bias tainted the resulting jury verdict, requiring automatic reversal. We reverse a trial court's ruling on the scope of voir dire for an abuse of discretion if the defendant demonstrates that the abuse substantially prejudiced his case. State v. Brady, 116 Wash.App. 143, 147, 64 P.3d 1258 (2003) (citing State v. Davis. 141 Wash.2d 798, 825-26, 10 P.3d 977 (2000)), review denied, 150 Wash.2d 1035, 84 P.3d 1230 (2004).
¶ 28 During voir dire, two jurors, Siciliana and Wiggs, stated that their past experiences as victims of sexual abuse would affect their ability to be fair and impartial. The trial court struck both Wiggs and Siciliana for cause. Ford did not object to this at trial.
¶ 29 Ford fails to provide any support for his argument, and instead he focuses on credibility issues, which we will not review on appeal. Thomas, 150 Wash.2d at 874, 83 P.3d 970. Even if we did consider his argument, it is evident that the trial court did consider the effects of Wiggs's and Siciliana's *60 statements on the other prospective jurors. Indeed, the trial court removed both of these prospective jurors for cause.
¶ 30 Neither do we agree with Ford's contention that these statements were "expert-like." SAG at 11 (capitalization omitted). Wiggs and Siciliana made these statements based on their personal experiences with sexual abuse; neither of these women purported to offer an expert opinion. Additionally, Wiggs and Siciliana fully disclosed their viewpoints on sexual abuse during voir dire. We find no error here.
¶ 31 We find no merit in Ford's argument that his first trial attorney rendered ineffective assistance in failing to (1) request a continuance when the trial court granted the State's motion to amend and (2) conduct proper voir dire. To demonstrate ineffective assistance of counsel, a defendant must make two showings: (1) that counsel's representation was deficient, and (2) that counsel's deficient representation caused prejudice. State v. McFarland, 127 Wash.2d 322, 334-35, 899 P.2d 1251 (1995). To show prejudice, a defendant must show that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have differed. State v. Crawford, 159 Wash.2d 86, 99-100, 147 P.3d 1288 (2006). In general, performance is deficient when it falls below an objective standard of reasonableness, but not when undertaken for legitimate reasons of trial strategy or tactics. State v. Horton, 116 Wash.App. 909, 912, 68 P.3d 1145 (2003) (citing McFarland, 127 Wash.2d at 334, 899 P.2d 1251).
¶ 32 Ford argues that his first counsel rendered ineffective assistance by failing to request a continuance after the trial court allowed the State to file an amended information. Ford argues that this was not a legitimate or tactical choice because the attorney needed more time to assess the amendment's effects before starting trial. But the State's amendment made no substantive change to the offenses charged in the original information and had no effect on the trial court's proceedings. Consequently, his attorney's decision to proceed to trial was legitimate.
¶ 33 Ford argues that his first counsel rendered ineffective assistance by conducting improper voir dire. Ford contends that his attorney not only allowed two jurors to taint the jury pool with their "inflammatory and highly prejudicial statements," but he also provoked Siciliana's statement that "`the most important thing you can do to support survivors is to believe them.'" SAG at 24 (quoting RP (Aug. 27, 2007) at 49). Contrary to Ford's argument, however, the attorney's performance was not deficient because (1) Wiggs and Siciliana primarily discussed their experiences with sexual abuse in response to the State's questions; (2) in asking Siciliana to clarify what she believed, Ford's attorney did not directly provoke her response about survivors; and (3) the attorney's decision to question Siciliana about her experience with sexual abuse was a proper tactical decision, considering that the purpose of voir dire is to determine whether any of the prospective jurors would have difficulty returning a fair and impartial verdict. Accordingly, Ford's ineffective assistance of counsel claim fails.
¶ 34 Finally, Ford argues that, "Taken together, the numerous errors in this case violated [his] right to due process." SAG at 26 (capitalization omitted). The cumulative error doctrine mandates reversal when the cumulative effect of nonreversible error(s) materially affects the trial outcome. State v. Newbern, 95 Wash.App. 277, 297, 975 P.2d 1041, review denied, 138 Wash.2d 1018, 989 P.2d 1142 (1999). We find no cumulative error.
¶ 35 We reverse Ford's count I conviction, vacate the lifetime no-contact order, and remand for a new trial. We affirm Ford's count II conviction and remand for resentencing as to count II.
I concur: ARMSTRONG, J.
HUNT, J. (dissenting).
¶ 36 I respectfully dissent from the majority's decision that the trial court committed reversible error by essentially compelling the jury to complete the verdict form on count I. Although I agree with the majority's resolution of Ford's other assignments of error for both counts, I write separately to refute its *61 conclusion that the trial court's oral instruction to the jury rose to the level of "manifest" constitutional error[4] that Ford may raise for the first time on appeal, even though he neither objected to the trial court's oral instruction below nor proposed a different instruction or course of action. Furthermore, I agree with the State that the record fails to show a substantial likelihood that the trial court's oral instruction to the jury, to complete the verdict form on count I, affected the outcome of Ford's case.

FACTS
¶ 37 At trial, the jury received two verdict forms: count I for second-degree rape of a child and count II for third-degree rape of a child. After the jury informed the trial court that it had finished deliberating, the trial court asked the foreperson, "Has the jury reached a unanimous verdict?" The foreperson responded, "Yes." The trial court then asked the foreperson, "Would you pass the verdict forms to my bailiff." IV Report of Proceedings (RP) at 390. But when the trial court began reading from the verdict forms, it noticed that the jury had left count I blank, even though it had filled in count II, finding Ford guilty of third-degree rape of a child.
¶ 38 The trial court stated, "I'm sending the jury back to the jury room. Verdict form No. 1 is completely blank. It must be filled in." After excusing the jury, the trial court added, "I believe we have just a momentary delay[.] I think they just forgot to fill out the form." IV RP at 390. No one objected to the trial court's oral instructions; nor did anyone propose a different course of action. The trial court then said, "I'm inclined to have [the bailiff] tell them if they have a question to write the question out and submit it to us. Is that agreeable?" IV RP at 391. Both parties agreed; yet, before the trial court took any action, the jury returned to the courtroom with a completed verdict form on count I, finding Ford guilty of second-degree rape of a child.

ANALYSIS
¶ 39 The majority adopts Ford's argument, raised for the first time on appeal, that the trial court's oral instruction to the jury, that the jury "must be in agreement on count I," affected the outcome of the verdict, thereby denying Ford his right to a fair trial.[5] (Emphasis added). But, contrary to Ford's argument, the trial court did not use that language, even though, as the majority notes, the trial court did not articulate the option of failing to reach a unanimous verdict. Instead the trial court stated, "I'm sending the jury back to the jury room. Verdict form No. 1 is completely blank. It must be filled in." IV RP at 390 (emphasis added). In my view, the trial court's instruction under the circumstances here do not rise to the level of coercion addressed in State v. Boogaard, 90 Wash.2d 733, 735, 585 P.2d 789 (1978).
¶ 40 In Boogaard, after the jury had deliberated for six or seven hours, the trial court asked the bailiff to inquire "how the jury stood numerically" because it was getting late at night.[6] When the bailiff told the trial court that the jury's vote was 10-2, the trial court polled the jurors to determine whether further deliberations would be fruitful. In spite of one juror's statement that it would not be possible to reach a verdict in 30 minutes, the trial court instructed the jury to deliberate for an additional half hour. Thirty minutes later, the previously deadlocked jury reached a unanimous verdict finding Boogaard guilty.
¶ 41 Here, in contrast, the jury informed the trial court that it had reached a verdict. Unlike the jury in Boogaard, the jury here said nothing about their being deadlocked, and there were no identifiable juror "holdouts." Majority at page 58. The jury's foreperson also responded, "Yes," when the trial court asked if the jury had reached a "unanimous verdict." Under these facts, the jury's leaving one count blank on the verdict form, without comment, does not equate to the Boogaard jury's clearly articulated deadlock; therefore, with all due respect to my learned *62 colleagues, the majority's attempted analogy to Boogaard does not succeed.
¶ 42 Similarly, I respectfully disagree with the majority's speculation that "it is equally possible that the jury walked back to the jury room ... and any hold outs simply acquiesced." Majority at 58 (emphasis added). Such speculation does not satisfy the applicable standard of review, which, as the majority acknowledges, Ford must meet to raise this challenge for the first time on appeal  he must show a "manifest" error, not merely a "possible" error, affecting a constitutional right. Majority at 57, 59. Such speculation about the mere possibility of the jury's having been "coerced" by the court's instruction to fill in the blank does not rise to the level of "manifest" error under the facts of this case, not even under the case law that the majority cites.
¶ 43 On the contrary, the mere "possibility" that there may have been a hold-out juror who changed his or her vote after returning to the jury room (as was beyond doubt the case in Boogaard) does not establish "manifest" error because it does not show (1) a reasonable probability that the trial's outcome would have differed if the [alleged] error had not occurred,[7] (2) "a substantial likelihood that the [alleged] trial irregularity affected the jury verdict, thereby denying the defendant a fair trial,"[8] or (3) "[a] strong, affirmative showing of misconduct... necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank and free discussion of the evidence by the jury."[9] (Emphasis added).
¶ 44 Nor does the record reflect that the trial court told the jury that it "must be in agreement." Br. of Appellant at 16 (emphasis added). This undisputed fact undermines the majority's conclusion that the trial court's oral instruction to fill in the blank on the verdict form "directly conflicted" with the written jury instructions, which expressly provided that the jury need not reach a unanimous verdict on each charge. Contrary to the majority's assertion, the trial court did not orally instruct the jury to reach a "unanimous verdict" on count I.
¶ 45 Instead, the trial court merely sought to correct what appeared to everyone present in the courtroom to have been an inadvertent oversight by the jury: The foreperson had already announced that the jury had reached a verdict, creating an inherent inconsistency with the blank verdict form for count I. Consistent with the trial court's appraisal,[10] the jury quickly filled in the blank after they returned to the jury room, before the trial court and counsel could complete their discussion about what further action, if any, to take. In short, the record here, in stark contrast to the record in Boogaard, does not support the majority's conclusion that it is "substantially likely"[11] that the court's oral instruction affected the outcome of Ford's verdict on count I. Majority at 59.
¶ 46 I agree with the majority that it would have been preferable for the trial court first to have brought the blank verdict form to the jury's attention and then to have asked the jurors if they had intended to leave it blank. But I respectfully disagree with the majority's conclusion that the trial court committed reversible error when, upon discovering the apparently inadvertently blank verdict form, the trial court simply told the jury that the form "must be filled in" with no objection by Ford. According to the foreperson, the jurors had already reached a verdict; thus, their having filled in the verdict form on count I *63 implied that they had simply neglected to fill in the verdict form on count II. Under these circumstances, which differ dramatically from those in Boogaard, the trial court's oral instruction was not "substantially likely"[12] to affect the jury's already determined, but not yet filled in, verdict form on count II.
¶ 47 Consistent with the trial court's action here, even Ford's defense counsel, George Brintnall, interpreted the jury's blank verdict form as a mere oversight. Brintnall stated that the trial court's instruction to fill in the blank "didn't seem to [affect the jurors' decision] because they came back in five minutes, or four minutes" with the completed form. Brintnall added, "I could not see a procedural issue there. The jury seemed to have made a decision already, they just hadn't filled out the forms correctly." IV RP at 434-35.
¶ 48 Again, in stark contrast to the facts in Boogaard, the record here is consistent with defense attorney Brintnall's unrefuted appraisal: After the trial court notified the jury that part of the verdict form was blank, the jury returned to jury room, completed the form, and returned to the courtroom after only a few minutes. The reasonable inference from this very short time is that the jury simply filled in the blank with its previously determined, but unrecorded, verdict on count I and spent no time on further deliberation. These facts clearly demonstrate that the trial court's instruction to the jury did not "suggest the need for agreement" or otherwise interfere with or affect the jury's deliberative process[13] as CrR 6.15(f)(2) prohibits.[14]
¶ 49 I would hold (1) the record indicates that, after reaching a unanimous decision on count I, the jury inadvertently forgot to complete the verdict form on that count; (2) Ford fails to show that the trial court's oral instruction to the jury  that the verdict form for count I "must be filled in"  was "substantially likely" to affect that previously decided, though as yet unrecorded, verdict; and (3) the oral instruction to the jury does not rise to the level of "manifest" error that Ford can raise for the first time on appeal. I would affirm both counts.
NOTES
[1] This court refers to victims by their initials.
[2] The respondent's brief also contains this portion of the trial record.
[3] In the attorney's letter, he stated:

Without further information of a credible nature, I cannot make a determination on the defendant's claim in this regard. Therefore, I do not feel that I can in good conscience bring an ineffective assistance claim as part of a motion for a new trial at this time. Again, appellate counsel may be able to develop this claim further, if new evidence presents itself.
CP at 43.
[4] See Majority at 57.
[5] See Majority at 59; Br. of App. at 16.
[6] Boogaard, 90 Wash.2d at 735, 585 P.2d 789.
[7] Majority at 57, citing State v. Thomas, 150 Wash.2d 821, 871, 83 P.3d 970 (2004).
[8] Majority at 58, citing State v. Hicks, 41 Wash. App. 303, 313, 704 P.2d 1206 (1985); (citing State v. Davenport, 100 Wash.2d 757, 762-63, 675 P.2d 1213 (1984)).
[9] Majority at 58, citing State v. Balisok, 123 Wash.2d 114, 117-18, 866 P.2d 631, cert. denied, 536 U.S. 943, 122 S.Ct. 2628, 153 L.Ed.2d 809 (2002); Br. of Resp. at 5.
[10] "I believe we have just a momentary delay[.] I think they just forgot to fill out the form." IV RP at 390.
[11] Nor does the majority harmonize its view  that it was "equally possible" that hold-out jurors might have abandoned their positions, Majority at 58  with the majority's later conclusion that it was "substantially likely that the trial court's instruction affected the outcome of Ford's trial." Majority at 59.
[12] Majority at 58-59.
[13] See Majority at 58.
[14] See Majority at 58.