# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59730-6-II |
| Respondent, | |
| v. | |
| COLLIE EDWARD BABBS, JR., | UNPUBLISHED OPINION |
| Appellant. | |

MAXA, J. – Collie Babbs appeals his conviction for second degree unlawful possession of a firearm. To support the conviction, the State established that Babbs had a prior nonviolent felony. Babbs argues that (1) his conviction for unlawful possession of a firearm based on a predicate nonviolent felony violates the Second Amendment to the United States Constitution, and (2) the trial court violated his right to a jury trial when it ordered the jury to continue deliberations after it told the court that it was unable to reach a verdict.

We hold that (1) Babbs's conviction for unlawful possession of a firearm based on a nonviolent felony does not violate the Second Amendment because the Second Amendment does not protect convicted felons, and (2) the trial court did not abuse its discretion in ordering the jury to continue to deliberate when the jury had not communicated to the trial court that it was hopelessly deadlocked.

Accordingly, we affirm Babbs's conviction for second degree unlawful possession of a firearm.

FACTS

*Background*

On December 6, 2022, Tacoma police officers Wyatt Gustason, Derek Nielsen, and Steven Pound were on patrol looking for a suspect. The officers approached a car matching the description of the suspect's car. Babbs was near the rear of the car walking away from the officers. They stopped Babbs, and let him go when they realized he was not the person they were looking for. But at some point, Nielsen saw Babbs drop something near the rear end of the vehicle. Pound checked the area under the back of the car and found a gun.

The State charged Babbs with second degree unlawful possession of a firearm. Babbs stipulated that he previously was convicted of a felony.

*Jury Trial*

The jury trial took place over two days. Four witnesses testified on behalf of the State.

The jury began deliberations at 3:15 PM on September 27, 2023. The jury deliberated for about an hour before the trial court released them for the day. The next day, the jury returned at 8:46 AM. At 11:01 AM the jury was released for 20 minute break. Around noon, the jury submitted a question requesting a transcript of Officer Pound's testimony. The jury was released for lunch shortly thereafter. At 1:21 PM, the jury returned from lunch and the trial court responded to their question.

At 4:16 PM, the jury submitted a second question: "We are unable to come to a unanimous decision at this time, what are our options going forward?" Clerk's Papers at 45. The trial court called the jury into the courtroom.

THE COURT: The reason I have called you back in the courtroom is to find out whether you have a reasonable probability of reaching a verdict. I must caution you because you are in the process of deliberating, it is essential that you give no indication about how deliberations are going. You must not make any remark here in the courtroom that may adversely affect the rights of either party, or may in any way disclose your opinion of the case or the opinions of the other members of the jury.

So I'm going to be directing my questions to the presiding juror. I will ask if there's a reasonable probability of the jury reaching a verdict within a reasonable time. The presiding juror must restrict his or her answer to yes or no when I ask this question and must not say anything else.

So can the presiding juror please stand?

Thank you.

Is there a reasonable probability of the jury reaching a verdict within a reasonable time?

(Pause)

THE COURT: And there is a long pause here. And I'm wondering if more time is what you really need.

(Pause)

THE COURT: And, again, a long pause.

Okay. Given the time, here's what I'm going to do: I'm going to send you all home to think about it. I'm going to have you come back tomorrow at 8:45. I'm going to give you more time to deliberate. And if you have any other questions, obviously, you're going to follow the same instructions for doing that. And we'll just check on your progress as the day goes. Okay?

Rep. of Proceedings (RP) at 174-75.

After the jury exited the courtroom, the trial court had the following colloquy with the parties:

THE COURT: What I would like to do is have them come – I've got a morning docket but they can deliberate in there. If they have not reached a verdict by noon I think I'm going to call it. It took roughly two days for the evidence to come in, and they will have deliberated for approximately two days by noon tomorrow, so.

BABBS: I guess, I mean, the bulk of the evidence –

THE COURT: I'm going to still have the colloquy, and I'll still ask again. And then I'll send them in and obviously Mr. Babbs needs to be here to answer that question about whether or not we should discharge the jury.

BABBS: Okay.

THE COURT: But I'm thinking the look on his face and the length of time that it took him to even stand up straight. I mean . . .

BABBS: Would the Court agree that essentially, when the Court inquired with him, the answer was non-responsive – or there was no answer.

THE COURT: No, there was no response. And even when I asked if he needed more time, he couldn't even answer that. I'm going to give them more time and then we'll just see how it goes. And we'll call the parties in if there's another question, obviously, of this nature, saying that they can't agree.

BABBS: Okay.

STATE: Understood.

THE COURT: You are excused for the day. I'm sorry this took so long.

BABBS: No, it's okay.

. . . .

STATE: Did you want to indicate a response, the Court inquired?

THE COURT: I'm not going to write a response to that question. I think I made a record in the court record that we're going to send them home again and try tomorrow.

BABBS: Okay.

THE COURT: The question says "at this time." So, again, kind of indicating more time.

BABBS: Thank you, Your Honor.

RP at 176-77.

Babbs did not object to the trial court's decision to allow more deliberations and did not request that the court declare a mistrial.

4

On September 29, the jury began deliberations at 8:44 AM. At 10:06 AM, they reached a verdict. The jury found Babbs guilty of second degree unlawful possession of a firearm.

Babbs appeals his second degree unlawful possession of a firearm conviction.

ANALYSIS

A.    SECOND AMENDMENT CLAIM

Babbs argues that his second degree unlawful possession of a firearm conviction based on a prior nonviolent felony violates the Second Amendment. We disagree.[1]

We review de novo the constitutionality of a statute. *State v. Koch*, 34 Wn. App. 2d 232, 237, 567 P.3d 653 (2025). And we presume statutes to be constitutional. *Id*.

RCW 9.41.040(1)(a) states that a person is guilty of first degree unlawful possession of a firearm if the person "owns, accesses, has in the person's custody, control, or possession, or receives any firearm" after being convicted of any "serious offense." RCW 9.41.040(2)(a)(i)(A) states that a person is guilty of second degree unlawful possession of a firearm if the person "owns, accesses, has in the person's custody, control, or possession, or receives any firearm" after being convicted of any felony not listed in the definition of first degree unlawful possession of a firearm.

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Second Amendment applies to the states as incorporated through the due process clause of the

---

[1] Initially, the State argues that Babbs waived his Second Amendment claim because he did not raise it in the trial court. However, a valid Second Amendment claim would constitute a manifest error affecting a constitutional right under RAP 2.5(a)(3). *State v. Koch*, 34 Wn. App. 2d 232, 236, 567 P.3d 653 (2025). Therefore, we will address this claim.

Fourteenth Amendment. *McDonald v. Chicago*, 561 U.S. 742, 777-78, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010).

In *Koch*, this court addressed the constitutionality of RCW 9.41.040(1)(a) under facts similar to this case. 34 Wn. App. at 236. As in this case, Koch was charged with second degree unlawful possession of a firearm under RCW 9.41.020(2)(a)(i)(A) based on prior nonviolent felonies. *Id*. at 235. The court held that the Second Amendment does not protect convicted felons, including people convicted of nonviolent felonies. *Id.* at 242, 244.

The holding in *Koch* was based on the fact that the United States Supreme Court has stated that longstanding prohibitions on the possession of firearms by felons are presumptively lawful. *United States v. Rahimi*, 602 U.S. 680, 699, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024); *District of Columbia v. Heller*, 554 U.S. 570, 626 & n.26, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008); *see also New York State Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 81, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022) (Kavanaugh, J., concurring). In addition, the Supreme Court has stated that the Second Amendment applies to law-abiding citizens. *Bruen*, 597 U.S. at 31-32. Felons are not law-abiding citizens. *Koch*, 34 Wn. App. at 243.

Three other Washington courts have reached the same conclusion as *Koch*. *State v. Olson*, 33 Wn. App. 2d 667, 683, 565 P.3d 128 (2025); *State v. Bonaparte*, 32 Wn. App. 2d 266, 270-71, 554 P.3d 1245 (2024), *review denied,* 4 Wn.3d 1019 (2025); *State v. Ross*, 28 Wn. App. 2d 644, 646, 537 P.3d 1114 (2023), *review denied,* 2 Wn.3d 1026 (2024).[2]

---

[2] In *State v. Hamilton*, Division One of this court presumed that felons were among the people that the Second Amendment protected. 33 Wn. App. 2d 859, 870, 565 P.3d 595, *review granted*, 4 Wn.3d 1037 (2025). However, the court rejected the defendant's Second Amendment challenge to the prohibition against felons possessing firearms because "disarming those with felony convictions is demonstrably consistent with America's historic tradition of firearms regulation." *Id.* at 871.

We follow *Koch* and hold that the Second Amendment does not protect Babbs because he is a felon and is not a law-abiding citizen. Therefore, we affirm Babbs's conviction of second degree unlawful possession of a firearm.

B.      COERCION OF JURY CLAIM

Babbs argues that the trial court violated his right to a jury trial when it ordered the jury to continue deliberations after it told the court that it was unable to reach a verdict. We disagree.[3]

1.      Legal Principles

The Sixth Amendment to the United States Constitution and article I, sections 3 and 22 of the Washington Constitution guarantee a defendant the right to a fair jury trial. This right includes "the right to have each juror reach his verdict uninfluenced by factors outside the evidence, the court's proper instructions, and the arguments of counsel." *State v. Boogaard*, 90 Wn.2d 733, 736, 585 P.2d 789 (1978).

To prevail on a claim that the trial court coerced a jury verdict, the appellant must establish a reasonably substantial possibility that the trial court's intervention improperly influenced the verdict. *State v. Ford*, 171 Wn.2d 185, 188-89, 250 P.3d 97 (2011). We examine the totality of the circumstances in assessing whether the appellant has made an affirmative showing of improper influence. *Id*. at 189.

A trial court can violate a defendant's jury trial right by failing to discharge a jury which is unable to reach a verdict after " 'protracted and exhausting deliberations.' " *State v. Jones*, 97

---

[3] Initially, the State argues that Babbs waived his judicial coercion claim because he failed to object when the trial court instructed the jurors to return the next day to resume deliberations. But a conviction resulting from a coerced jury is manifest constitutional error that can be raised for the first time on appeal under RAP 2.5(a)(3). *State v. Ford*, 171 Wn.2d 185, 188, 250 P.3d 97 (2011). Therefore, we will address this claim.

Wn.2d 159, 163-64, 641 P.2d 708 (1982) (quoting *Arizona v. Washington*, 434 U.S. 497, 509, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978)). To justify discharging the jury, there must be " 'extraordinary and striking circumstances which clearly indicate to a court . . . that the ends of substantial justice cannot be obtained without discontinuing the trial.' " *Jones*, 97 Wn.2d at 163 (quoting *State v. Bishop*, 6 Wn. App. 146, 150, 491 P.2d 1359 (1971)). "[I]f the jury, through its foreman and of its own accord, acknowledges that it is hopelessly deadlocked, there would be a factual basis for discharge if the other jurors agree with the foreman. The jury's acknowledgment of hopeless deadlock is an 'extraordinary and striking' circumstance." *Jones*, 97 Wn.2d at 164.

In *Jones*, the jury deliberated for 11 hours after a four day trial. *Id.* at 165. The court asked the jury whether it could reach a verdict within 90 minutes. *Id*. at 160-61. The presiding juror said yes. *Id*. After 90 minutes had passed, the trial court again asked the jury if it could reach a verdict within 90 minutes. *Id*. at 161. The presiding juror stated, and the rest of the jury agreed, that it could not. *Id*. The trial court declared a mistrial, noting "that the jury as a whole feels there is no possibility of arriving at a verdict within a reasonable time." *Id*.

The Supreme Court reversed, noting that the jury's 11 hour deliberation was "hardly extraordinary and striking" given that the trial had lasted almost four days. *Id*. at 165. The court noted that the trial court did not sufficiently establish a genuine deadlock and concluded that the trial court abused its discretion when it granted a mistrial. *Id*. at 166.

We review the trial court's decision not to discharge a jury after it reports that it is deadlocked for an abuse of discretion. *Id.* at 163. "It is well established that a trial judge should be allowed broad discretion in deciding whether the circumstances justify a discharge of the jury." *Id.*

2.    Analysis

Here, after jury trial which lasted about two days, the jury deliberated for an hour on the afternoon of the last day of the trial.  The jury deliberated for a little over six hours the following day before it communicated to the trial court that it was unable to reach a verdict.  The court called the jury into the courtroom and asked the foreman if there was a reasonable probability that the jury would be able to reach a verdict in a reasonable time.

The foreman did not respond to the trial court's question.  The trial court acknowledged the lack of response, ordered the jury to return the next day to continue deliberations, and released them for the day.  The next day, the jury returned a verdict after a little over an hour of deliberations.

We conclude that there was no improper judicial coercion and the trial court did not abuse its discretion when it did not declare a mistrial.  First, the jury had been deliberating for a little over seven hours total when it communicated to the court that it was unable to reach a verdict.  While this is not an especially short amount of time, it is by no means "extraordinary and striking" given that it took about two days for the evidence to come in during the trial.

Second, when the trial court invited the jury into the courtroom and questioned the foreman, the foreman did *not* state that the jury was hopelessly deadlocked.  In fact, he did not respond to the trial court's questions at all.  While it is unusual that the foreman did not respond to the trial court's questions, the lack of response does not amount to an affirmative declaration that the jury was hopelessly deadlocked.

Third, it is significant that Babbs did not object when the trial court directed the jury to continue its deliberations.  Babbs apparently did not have a concern that the trial court was

coercing the jury to reach a verdict. The lack of an objection suggests that Babbs wanted the jury to keep deliberating.

Babbs argues that when the jury told the trial court that they were unable to come to a unanimous decision, that alone was sufficient to declare a mistrial. He points to the fact that the case was simple and argues that the jury deliberated for a long time. He also argues that the presiding juror's lack of response to the court's question about whether he thought the jury could reach a verdict within a reasonable amount of time means that the presiding juror did not tell the court that this could be achieved.

But the jury's submission of a comment to the trial court that it is unable to come to a unanimous decision is not the same as the foreman acknowledging, and the other jurors agreeing, that the jury is hopelessly deadlocked. And the foreman's lack of response to the trial court's questions could be interpreted to mean that he did not know whether a verdict could be reached within a reasonable amount of time. Given the unclear nature of the foreman's response and the fact that we afford great deference to the trial court's decision not to declare a mistrial, we disagree with this argument.

Babbs also argues that the trial court coerced the jury by ordering them to "think about it" and return to continue deliberations the next day. RP at 175. He argues that the court imposed pressure on the jurors to reach a verdict, citing three jurors who had indicated on questionnaires that they would have work, child care, and financial issues if they were to serve on the jury.

The trial court's order to the jury to "think about it" and return the following day to continue deliberations was not coercive. The trial court did not order the jury to reach a verdict; it merely ordered them to continue to deliberate. And the trial court emphasized that the jury could ask additional follow up questions the next day as they arose. Babbs has not shown that

there is a reasonably substantial possibility that the trial court's actions improperly influenced the verdict.

Accordingly, we hold that the trial court did not abuse its discretion when it ordered the jury to continue deliberations.

CONCLUSION

We affirm Babbs's conviction for second degree unlawful possession of a firearm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
VELJACIC, A.C.J.

_____
LEE, J.